745 F.2d 1577
 241 U.S.App.D.C. 1, 20 Ed. Law Rep. 1075
 Pierce LUNCEFORD
v.
DISTRICT OF COLUMBIA BOARD OF EDUCATION, et al., The
Hospital for Sick Children, Appellant.
Pierce LUNCEFORD
v.
DISTRICT OF COLUMBIA BOARD OF EDUCATION, et al., Appellants,
The Hospital for Sick Children.
 Nos. 83-2209, 83-2210.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 18, 1984.
Decided Oct. 16, 1984.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 83-02132).
 Richard B. Nettler, Asst. Corp. Counsel for the District of Columbia, Washington, D.C., with whom John H. Suda, Principal Deputy Corp. Counsel, and Charles C. Reischel, Deputy Corp. Counsel for the District of Columbia, Washington, D.C., were on the brief for appellant, District of Columbia Bd. of Educ.
 Patrick Kavanaugh, Washington, D.C., with whom Stephen A. Trimble, Washington, D.C., was on the brief for appellant, Hospital for Sick Children.
 Matthew B. Bogin, Washington, D.C., for appellee.
 Before GINSBURG and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 Under the Education for All Handicapped Children Act of 1975, Sec. 5(a), 20 U.S.C. Sec. 1415 (1982) (EAHCA), the District of Columbia Board of Education (the District) must provide notice and a full hearing procedure before it can change the educational placement of a handicapped child under its jurisdiction, unless the child's parent or guardian consents to the change.[1] This civil action raises a question of definition: what constitutes a child's "educational placement" for EAHCA-administration purposes.
 
 
 2
 The case also presents a "state action" issue. The district court's judgment enjoins action of a private hospital, the Hospital for Sick Children, along with action of the District. As a preliminary matter, we determine whether the private hospital is answerable at all for a claim of the kind plaintiff-appellee has attempted to state.
 
 I. BACKGROUND
 
 3
 The appellee, Pierce Lunceford, is a multi-handicapped young man with profound mental retardation and crippling conditions. Although Pierce is over eighteen years old, his development in many areas has not progressed beyond that of a five-month-old child. Pierce became a ward of the District of Columbia and began living at Forest Haven, the District's institution for the mentally retarded, in May 1966.
 
 
 4
 As required by the EAHCA, 20 U.S.C. Sec. 1415(b)(1)(B), Pierce was assigned a surrogate parent.[2] The parent requested a hearing, pursuant to the EAHCA, id. Sec. 1415(b)(2), on the adequacy of Pierce's educational placement. A hearing was held in December 1980; the hearing officer found Pierce's educational placement in Forest Haven inappropriate, and ordered the District to provide Pierce a new educational placement.
 
 
 5
 In February 1981, in response to the District's request, Pierce was admitted to residence at the Hospital for Sick Children (HSC). HSC is a private hospital serving children with chronic illnesses or handicapping conditions. It operates an inpatient hospital and an outpatient special education program for profoundly mentally retarded children.
 
 
 6
 In HSC's education program, Pierce received prescribed therapy. HSC, through its inpatient facilities, also treated Pierce for seizures (a problem that first developed after his admission to HSC) and feeding difficulties, and made adjustments in his wheelchair.
 
 
 7
 In November 1982, HSC informed Forest Haven that Pierce was ready to be discharged. The hospital recommended that Pierce continue in the education program on an outpatient basis "since he is no longer medically appropriate for hospitalization at HSC." Stipulated Fact No. 16. The surrogate parent was notified and protested that without parental consent, Pierce could not be discharged until completion of an EAHCA hearing procedure. HSC informed the parent that as a private hospital it was not covered by the EAHCA. The District had previously expressed its opinion that the move from HSC back to Forest Haven would not be a change in educational placement; accordingly, in the District's view, the EAHCA did not require completion of hearing procedures in advance of the proposed transfer.
 
 
 8
 Pierce's discharge was postponed until the District could provide appropriate daily transportation between Forest Haven and HSC. Transportation was made available in July 1983, and Pierce's discharge was set for July 29, 1983.
 
 
 9
 On July 26, 1983, however, Pierce Lunceford, by his surrogate parent, filed a complaint and motion for a temporary restraining order in the district court. A temporary restraining order issued on July 29. The parties agreed that the preliminary injunction application would be combined with consideration on the merits and that the merits would be decided on stipulated facts. The district court held that a change in residence from HSC to Forest Haven, with continued education at HSC, would be a change in educational placement; that HSC was a "state actor" covered by the EAHCA; and, therefore, that Pierce could not be discharged from HSC until his surrogate parent consented or until HSC completed the hearing procedures described in the EAHCA.
 
 
 10
 The District and HSC appealed. For the reasons stated below, we reverse the district court's judgment and direct the district court to dismiss the action against HSC and enter judgment on the merits for the District.
 
 II. HOSPITAL FOR SICK CHILDREN
 
 11
 The district court's judgment is cryptic; it appears to hold HSC responsible for retaining Pierce Lunceford as an inpatient pending completion of EAHCA hearing procedures on two bases: either directly and independently under the statute, or under the "state action" doctrine, or on both grounds in combination. As the surrogate parent concedes, however, Congress addressed the EAHCA's procedural requirements only to state or local educational agencies or other public authorities established by state law to provide free public education. See 20 U.S.C. Secs. 1415(a), 1401(7)-(8), (22). HSC is not such an agency or authority.
 
 
 12
 The surrogate parent suggests as an appropriate statutory basis for the action against HSC, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794. Section 504 reads:
 
 
 13
 No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 14
 Assuming arguendo HSC's amenability to this measure by reason of its receipt of Medicaid and Medicare funds, and no preclusion of appellee's resort to the legislation,[3] it remains illogical to argue that HSC discriminated against Pierce because of his handicap.
 
 
 15
 As stipulated, HSC's decision to discharge Pierce rested on the staff's determination that "he is no longer medically appropriate for hospitalization at HSC." Stipulated Fact No. 16. Nor does there appear to be any genuine doubt that HSC's services "are available only to handicapped children." HSC Brief at 21. Ten children, the hospital's records showed, were waiting for HSC beds at the time Pierce Lunceford sought the temporary restraining order, Defendant's Exhibit No. 8, Lunceford, Civ. No. 83-2132 (D.D.C. Oct. 14, 1983); each of the wait-listed children apparently fit the Rehabilitation Act's definition of "handicapped individual." See 29 U.S.C. Sec. 706(7)(B). Under the circumstances, the discharge of Pierce to permit the admission of another sorely handicapped child rationally could not amount to disadvantageous treatment "solely by reason of his handicap." See Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) ("[N]either the language, purpose, nor history of Sec. 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds."); Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir.1982) ("Manifestly, in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the 'free appropriate education' required by EAHCA must be shown.").
 
 
 16
 The district court's principal reliance in enjoining HSC, it seems, was on the notion that, as a recipient of public funding, HSC was bound by the same statutory and due process requirements "as government." Lunceford, slip op. at 4. Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), however, rules out any "state action" peg for the district court's judgment against HSC.
 
 
 17
 In Blum, the Supreme Court considered whether state action was implicated in private nursing homes' decisions to transfer particular Medicaid patients to different facilities providing lower levels of care. The challengers claimed they did not receive adequate notice and hearings before they were transferred. Like HSC, the nursing homes received large federal financial assistance. Federal regulations required a home to establish a committee to determine, inter alia, the appropriateness of each patient's continued residence at the facility. The Supreme Court held that the nursing homes' transfer decisions were not state action. Heavy regulation by government, the High Court restated, "does not by itself convert [a private facility's] action into that of the State." Id. at 1004, 102 S.Ct. at 2786 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). Generally, the Court indicated, the action of a nongovernmental entity will not be held to standards limiting official action absent government coercion or significant government encouragement of the measure under inspection. Blum, 457 U.S. at 1004, 102 S.Ct. at 2786. In rejecting "state action" characterization of the transfer decisions in Blum, the Court emphasized that the decisions "ultimately turn[ed] on [private actors'] medical judgments." Id. at 1008, 102 S.Ct. at 2788.
 
 
 18
 Like the nursing homes' transfer decisions, HSC's discharge decision was a medical judgment "made by private parties according to professional standards that are not established by the State." Id. Blum controls this case; it leaves no room for holding HSC's decision to discharge Pierce Lunceford to strictures that the Constitution or other relevant federal law--here, the EAHCA--places only on "government action."[4] Blum means that, absent any plausible statutory basis for reaching HSC here as a nonstate actor--and, as we have explained, no such basis has been shown--the case should have been dismissed to the extent that it sought relief against HSC.
 
 III. DISTRICT OF COLUMBIA
 
 19
 Our decision that the injunction against HSC was improper does not end the case. The EAHCA does impose exacting procedural requirements on public authorities, and the District unquestionably is covered by the Act. If a parent or guardian objects to a proposed change in a child's educational placement, the EAHCA requires that the change not take place until the objections are aired before the appropriate public education agency in a full hearing procedure, including judicial review. 20 U.S.C. Sec. 1415(e). If the move to Forest Haven constitutes a change in educational placement, and HSC does not continue to house Pierce, it appears that the District, in order to satisfy its statutory obligation, must provide Pierce other facilities--ones more closely resembling HSC's--which would maintain his educational placement at least until hearings are completed. Thus, we reach the central question whether the move from HSC to Forest Haven, with continued education at HSC, is a change in educational placement under the EAHCA.
 
 
 20
 First, we reject the argument that simply because Pierce, after his discharge, will continue to receive the same HSC daytime education he now receives as an HSC resident, his educational placement cannot be said to change. As courts that have required education agencies to provide free residential care as part of a free education under the EAHCA have noted, the educational needs of a severely handicapped child such as Pierce are closely intertwined with the need for other residential services. See Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir.1983); Kruelle v. New Castle County School District, 642 F.2d 687, 693-95 (3d Cir.1981). Therefore, we look beyond the concededly unchanged HSC daytime education to residential services provided Pierce at HSC and at Forest Haven.
 
 
 21
 The leading precedent on what type of change constitutes a change in educational placement is Concerned Parents v. New York City Board of Education, 629 F.2d 751 (2d Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). The Second Circuit stated in Concerned Parents that a change in educational placement occurs only when there is a change in the "general educational program in which a child ... is enrolled, rather than mere variations in the program itself." Id. at 754. Under Concerned Parents, a move from a "mainstream" program to one consisting only of handicapped students would constitute a change in educational placement; a move from one mainstream program to another, with the elimination of a theater arts class, would not be such a change.
 
 
 22
 The type of program required by a profoundly handicapped child such as Pierce is too individualized to enable us to say that a move from one "residential" placement to another can never be a change in educational placement. However, the Concerned Parents reasoning[5] suggests that appellee must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement. Appellee has not met this standard.
 
 
 23
 The main change appellee-surrogate parent has alleged[6] is in the feeding treatment Pierce will receive at Forest Haven. Appellee does not dispute that Pierce will be fed on a one-to-one basis at Forest Haven, as he is in HSC, or that the Forest Haven feeding program was developed by a nutritionist. Affidavit of Emille Grier, Lunceford, Civ. No. 83-2132 (D.D.C. Oct. 14, 1983). Appellee contends only that the overworked Forest Haven staff cannot administer its feeding program as well as HSC administers its program. Declaration of Sheila Kaplan, Lunceford, Civ. No. 83-2132 (D.D.C. Oct. 14, 1983). This can be a problem, and the subject of a complaint and hearings under the EAHCA.[7] But it is not alone sufficient to constitute a change in educational placement, requiring the District to keep Pierce at HSC or a comparable facility until hearings are completed.
 
 
 24
 Finally, we address appellee's argument that under the court order in Evans v. Washington, 459 F.Supp. 483 (D.D.C.1978), Pierce cannot be re-admitted to Forest Haven in any case. In Evans, Judge Pratt found that constitutional rights of Forest Haven residents had been violated; he issued an order, consented to by the defendants, detailing procedures for, among other things, deinstitutionalization of patients and interim operation of Forest Haven. Section 12 of the order stated: "There shall be no admissions to Forest Haven until further order of this Court." Id. at 488.
 
 
 25
 The District argues that section 12 of the Evans order covers only new admissions, not returns or readmissions. In the district court, the District submitted in support of its interpretation an affidavit of the Acting Superintendent of Forest Haven. The affidavit stated that although "[n]o new persons can be admitted or committed to Forest Haven, ... Forest Haven residents have lived outside of Forest Haven [in community residences, hospitals, other institutions] and then [have] returned." Affidavit of Donald Brooks, Lunceford, Civ. No. 83-2132 (D.D.C. Oct. 14, 1983). The surrogate parent does not challenge the accuracy of the Acting Superintendent's affidavit. We believe it reflects a proper reading and application of Judge Pratt's order.[8]
 
 
 26
 Pierce's surrogate parents have diligently sought the best possible treatment for Pierce, and this court is sympathetic to their concerns. But resources are not infinite, and many other demands compete for limited public funds. The EAHCA does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each child. See Hendrick Hudson District School Board v. Rowley, 458 U.S. 176, 198-200, 102 S.Ct. 3034, 3046-3048, 73 L.Ed.2d 690 (1982).
 
 
 27
 In this case, the District, using the residential services of Forest Haven and the outpatient education program of HSC, has fulfilled its obligation under the EAHCA to maintain Pierce's educational placement pending any complaint proceedings the surrogate parent may bring.
 
 
 28
 We reverse the district court's judgment for plaintiff-appellee, and direct dismissal of the action against HSC, and judgment on the merits for the District of Columbia.
 
 
 29
 It is so ordered.
 
 
 
 [1]
 The notice requirement is stated in 20 U.S.C. Sec. 1415(b)(1)(C) (1982). The EAHCA requires an educational agency to provide "an impartial due process hearing," id. Sec. 1415(b)(2), for any complaint "relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." Id. Sec. 1415(b)(1)(E). Thus a parent or guardian always has an opportunity to present complaints relating to a child's educational placement, even if the complained-of situation does not amount to a change in educational placement
 However, while hearings on a complaint take place, "the child shall remain in [his or her] then current educational placement" unless the parent agrees to a change. Id. Sec. 1415(e)(3). The result of these provisions is that if a parent complains of a proposed change in educational placement, that change cannot take place until the hearing procedures required by the EAHCA are completed.
 
 
 [2]
 Peter Hobbs was Pierce Lunceford's surrogate parent prior to Pierce's transfer to the Hospital for Sick Children; Hobbs was later replaced by Carol Leach. Both individuals are volunteers from the District of Columbia Association for Retarded Citizens. This court commends both Mr. Hobbs and Ms. Leach for their vigilant protection of Pierce's right to an appropriate education
 
 
 [3]
 But see Smith v. Robinson, --- U.S. ----, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) ("[T]here is no doubt that the remedies, rights, and procedures Congress set out in the [EAHCA] are the ones it intended to apply to a handicapped child's claim to a free appropriate public education.")
 
 
 [4]
 In Blum, the challengers sued state officials responsible for administering the Medicaid program and for regulating nursing homes, not the homes themselves. However, the Court's analysis makes it clear that suits against individual nursing homes would have fared no better. See Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)
 Appellee cites discussions between HSC and Forest Haven concerning Pierce's transfer back to Forest Haven, and the District of Columbia Department of Human Services' referral to HSC of the surrogate parent's letter of protest, as evidence that the government "exercises some form of control" over HSC. Appellee Brief at 25-26. If such communication between the government and a private entity evidenced government control sufficient to trigger "state action" limitations, then the Supreme Court certainly would have found state action in Blum, considering the regular communication between the nursing homes and state officials regarding assessments of patients' care needs. See 457 U.S. at 1010, 102 S.Ct. at 2789.
 
 
 [5]
 In reaching its definition of a change in educational placement, the Concerned Parents court considered the statutory provisions and federal regulations using the term, 629 F.2d at 754, and the legislative history of the EAHCA. The court found in the Act's history a primary legislative concern about "erroneous identification or classification of children as handicapped." Id. Of particular significance for the case at hand, the court observed that an interpretation of change in "educational placement" that would include every curriculum change "would virtually cripple the Board's ability to implement even minor discretionary changes within the educational programs provided for its students; that interpretation would also tend to discourage the Board from introducing new activities or programs or from accepting privately sponsored programs." Id. at 755. In the present case, an interpretation of change in "educational placement" that would include all changes in residence would certainly discourage the District from temporarily changing a child's residence to improve his education
 
 
 [6]
 Both Forest Haven and HSC are residential placements, providing 24-hour-a-day care. The surrogate parent concedes that "[a]ccording to the discharge plan, the educational services that Pierce Lunceford receives at the [HSC outpatient] Education Department will not change as a result of his discharge." Stipulated Fact No. 22. The Education Department program includes the therapy that the hearing officer ordered the District to provide in 1980
 Appellee acknowledges that Pierce's medical condition has remained stable since November 23, 1982, Stipulated Fact No. 23, and has alleged no medical service Pierce needs that would not be provided at Forest Haven. Moreover, it is unlikely that any medical service provided by HSC but not provided by Forest Haven would be covered by the EAHCA. As Judge Penn observed in McKenzie v. Jefferson, 566 F.Supp. 404, 411 (D.D.C.1983), hospitalization can come under the EAHCA only as a "related service," and medical services are limited under related services to those for "diagnostic and evaluation purposes only." See 20 U.S.C. Sec. 1401(17) (1982). To the extent that the district court in the present case understood the EAHCA to entitle Pierce to general medical care, it misperceived the statute.
 
 
 [7]
 See supra note 1
 
 
 [8]
 We reject appellee's argument that Pierce's original admission to Forest Haven in 1966 was "voided" by the Mentally Retarded Citizens Constitutional Rights and Dignity Act, D.C.Code Ann. Secs. 6-1901 to -1985 (1981). Section 6-1985 states that for those already institutionalized as of the effective date of the Act--March 3, 1979--the admission and commitment procedures of the Act would not be applicable. Instead, the commitment or admission of such residents would be reviewed; nothing indicates that the Act itself voids any commitment or admission