**Floretta McKENZIE, Superintendent, D.C. Public Schools, Appellant,**

v.

**Christopher SMITH, by his parents.**

**No. 83–1525.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1985.

Decided Aug. 30, 1985.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellant.

Matthew B. Bogin, Washington, D.C., with whom Beth Goodman, Washington, D.C., was on brief, for appellees.

Before TAMM, MIKVA, and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Floretta McKenzie, Superintendent of the District of Columbia Public Schools (DCPS), appeals a district court order requiring DCPS to place and fund a handicapped child in a residential special education facility pursuant to the Education for All Handicapped Children Act (EAHCA or Act). 20 U.S.C. §§ 1400–1461 (1982).[1] For the following reasons, we affirm the district court's order in every respect except that part granting attorney fees.

## I. BACKGROUND

Christopher Smith, born on October 26, 1967, is a learning disabled child with emotional problems. From the time he entered school in 1973, he has received special education in private day schools. He began his education at Christ Church Child Center and transferred to Kingsbury Lab School (Kingsbury) in 1977. Although his parents located and placed Christopher at both schools, DCPS, pursuant to the EAHCA, found that they were appropriate placements and funded Christopher's education. *See* 20 U.S.C. § 1413(a)(4)(B).

This dispute began in the spring of 1982 when the staff at Kingsbury, in consultation with Christopher's parents, determined that because of increasing emotional problems and unsatisfactory educational progress, Christopher needed a full-time residential-educational program. In May of 1982, Kingsbury officials drafted a preliminary individual education program (IEP)[2] for the 1982–83 school year, recom-

---

1. For an overview of the EAHCA, see *Board of Education v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 3037–39, 73 L.Ed.2d 690 (1982); Comment, *Beyond Conventional Education: A Definition of Education Under the Education For All Handicapped Chidren Act of 1975*, 48 LAW & CONTEMP.PROBS. 64 (1985); Note, *Enforcing the Right To An "Appropriate" Education: The Education For All Handicapped Children Act of 1975*, 92 HARV.L.REV. 1103 (1979).

2. An IEP is a written statement of a handicapped child's present educational level, future educational goals for the child, future educational services to be provided to him, and the extent to which he will be able to participate in regular educational programs. 20 U.S.C. § 1401(19). The IEP is the *"modus operandi* of the Act." *Burlington School Committee v. Department of Education*, — U.S. ——, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). It is developed jointly by a qualified representative of the local educational agency, the child's teacher, the parents or guardian, and when appropriate, the child.

mending that Christopher be placed in a "full-time residential placement designed to teach students whose primary handicap is learning disabilities, but whose emotional overlay problems interfere with academic progress." Record Excerpts (R.E.), Plaintiff's Exhibit 9. Christopher's parents contacted a number of residential schools, and on June 3, signed a contract for the 1982–83 school year with Vanguard School in Lake Wales, Florida.

On July 1, Karen Duncan, head teacher at Kingsbury, officially notified DCPS that Christopher had completed the program at Kingsbury and needed a new placement. On July 15, a meeting was held to review Christopher's IEP.[3] Four Kingsbury officials, Christopher's father, his counsel, and a DCPS official were present at that meeting. Salena Kirby, the DCPS representative, disagreed with the IEP's residential placement recommendation.[4] DCPS subsequently requested more information, and the Smiths submitted a Psychoeducational Evaluation by Vanguard School and a report by Dr. Milton Glatt, the psychiatrist Christopher had been seeing for over three years.

On July 26, 1982, Howard Mabry, a DCPS clinical psychologist, notified the Smiths that Christopher was scheduled for a Psychological Evaluation on July 29. The Smiths refused to consent to duplicative psychological tests but agreed to have Mr. Mabry interview Christopher. After meeting with the child for approximately one hour, Mr. Mabry produced a one-and-a-half page report in which he described Christopher as a learning disabled child with behavioral problems. Mr. Mabry concluded that Christopher was making progress in his education and recommended that the same type of educational program be continued. Thus, in Mr. Mabry's opin-

ion, a residential placement was inappropriate.

In a "Notice of Proposed Change in Educational Program" dated August 12, DCPS notified the Smiths that Christopher was to be placed in a learning disabilities program at Coolidge Public High School in Washington, D.C. Although his IEP for 1982–83 stated that Christopher was to spend no time in regular classes, in the proposed Coolidge program he was to receive at least 25% of his academic instruction in regular education. Because they did not believe Coolidge constituted an appropriate placement, the Smiths objected to DCPS' proposal and requested a due process hearing pursuant to 20 U.S.C. § 1415(b)(2).

A hearing was held on September 1, 1982 to consider the appropriateness of the proposed placement at Coolidge. The hearing officer, in a September 28 determination, held that Christopher was multihandicapped because he was both "seriously emotionally disturbed" and learning disabled.[5] He further held that the proposed program at Coolidge was inappropriate and that a residential placement was necessary. DCPS was given until October 28 to propose an appropriate residential placement. On October 8, DCPS asked for a clarification of the hearing officer's determination and an extension of time to comply. The hearing officer responded on October 28 and gave DCPS until November 3 to propose an appropriate residential placement.

DCPS did not comply with the hearing officer's order, nor did it seek a stay. Instead, on January 7, 1983, DCPS filed a complaint in the Superior Court of the District of Columbia asking the court to vacate the hearing officer's determination that a residential placement was necessary and to order placement at Coolidge.[6] The Smiths

---

**3.** *See* 20 U.S.C. § 1414(a)(5); 34 C.F.R. § 300.-343(d) (IEP must be reviewed and, if appropriate, revised not less than once a year).

**4.** Carrie Johnson, another DCPS official, apparently did not make it to the meeting in time to participate, but signed as being present and noted her disagreement with the residential place-

ment. *See* Record Excerpts (R.E.), DCPS Pretrial Statement at 4.

**5.** *See* 34 C.F.R. § 300.5(b)(8), (9).

**6.** "Any party aggrieved by the findings and decision ... [of a hearing officer], shall have the right to bring a civil action ... in any State court of competent jurisdiction or in a district

removed the case to the United States District Court for the District of Columbia and filed an answer and counterclaim. Because they had enrolled Christopher at Vanguard School without DCPS approval, the Smiths sought an order requiring DCPS to place and fund Christopher at Vanguard.

Following a trial on April 14 and 15, 1983, the district court held that DCPS failed to provide a free appropriate public education because the placement offered at Coolidge was not based on adequate consideration of Christopher's individual needs. The court further held that while it was not perfect, Vanguard was the best placement available and that it was an appropriate placement for the 1982–83 school year. Finally, the court granted the Smiths reimbursement for the costs of sending Christopher to Vanguard and awarded them attorney fees and costs.

## II. DISCUSSION

A. *DCPS' Failure to Provide a "Free Appropriate Public Education"*

■ In *Board of Education v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982), the Supreme Court set forth the proper scope of judicial review in suits brought under 20 U.S.C. § 1415(e)(2): "First, has the State complied with the procedures set forth in the Act? And Second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" In making these determinations, the district court must make an independent review of the evidence, *Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050, but in doing so it is to give "due weight" to the expertise of the

school officials responsible for the child's education. *Id.* at 206, 102 S.Ct. at 3051. Then, "basing its decision on the preponderance of the evidence," the court "shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(e)(2).

■ DCPS failed both prongs of the *Rowley* inquiry. After disagreeing with the residential placement proposed in Christopher's IEP, DCPS did not comply with the procedural requirements of the Act. Additionally, and partly as a consequence of this noncompliance, DCPS failed to demonstrate that its proposed placement was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

When a handicapped child is placed in a private school, the responsible public agency, at its discretion, may permit the private school to conduct meetings to review and revise the child's IEP. 34 C.F.R. § 300.-347. Even in such cases, however, "responsibility for compliance with [the EAHCA] remains with the public ... educational agency." *Id.* In the present case personnel at Kingsbury drafted Christopher's 1982–83 IEP. At the July 15 IEP review meeting, the two DCPS representatives disagreed with the proposed residential placement, and appropriately [7]—albeit cursorily [8]—registered their disagreement.

DCPS could have responded to the proposed residential placement by "refus[ing] to ... change[ ] the ... educational placement of the child." 20 U.S.C. § 1415(b)(1)(C). Instead, DCPS chose to "propose[ ] [a] ... change," *id.*, in Christopher's current placement, from a private special education day school to a special

court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

7. *See* 34 C.F.R. § 300.347 (public agency representative must "[a]gree to any proposed changes

in the [educational] program before those changes are implemented").

8. Salena Kirby signed as being present at the meeting and attached a note saying, "I don't agree with everything in IEP especially 9–a [residential placement]. Additional reports are needed to document some goals and objectives of the IEP." Carrie Johnson added, "Documentation also needed for residential placement." R.E., Plaintiff's Exhibit 9.

education program in Coolidge Senior High School.[9] In either event, it was obligated under the EAHCA to "[i]nsure that [its] placement decision [was] made by ... persons knowledgeable about the child, the meaning of the evaluation data, and the placement options," 34 C.F.R. § 300.533(3), and to provide appropriate written notice to the Smiths. 20 U.S.C. § 1415(b)(1)(C). Such notice must include:

> (a)(2) A description of the action proposed ... by the agency, an explanation of why the agency proposes ... to take the action, and a description of any options the agency considered and the reasons why those options were rejected;
>
> (3) A description of each evaluation procedure, test, record, or report the agency uses as a basis for the proposal ...; and
>
> (4) A description of any other factors which are relevant to the agency's proposal....

34 C.F.R. § 300.505.

The importance of these procedural safeguards "cannot be gainsaid." *Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050. Indeed, the substance of the EAHCA is in essence embodied in the procedural mechanisms it mandates. *See id.* at 206, 102 S.Ct. at 3050 ("[A]dequate compliance with the procedures prescribed [will] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."); *see also Smith v. Robinson*, —— U.S. ——, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984) (The procedures "effect Congress' intent that each child's individual educational needs be worked out through a process that ... includes ... detailed procedural safeguards."). The underlying assumption of the Act is that to the extent its procedural mechanisms are faithfully employed, handicapped children will be afforded an appropriate education.

It was particularly important in this case that DCPS faithfully comply with the EAHCA's requirements. Christopher's current placement at Kingsbury was no longer available, and those who knew him best, including personnel at Kingsbury, his psychiatrist, and his parents, insisted that he needed a residential placement. Moreover, DCPS had never been directly involved in providing the child's education, and had at best participated secondarily in developing his IEPs. In these circumstances, it was essential that school officials become knowledgeable about Christopher's individual needs in order to make an appropriate placement decision. Upon deciding to transfer a child who had spent his entire educational life in private special education programs to a large public high school where at least one-fourth of his time would be spent in regular classes,[10] it was equally essential that DCPS adequately explain the basis for its placement decision and the services to be provided at Coolidge, as well as how those services could meet Christopher's individual needs.

Instead, DCPS sent the Smiths a form notice, captioned, "Notice of Proposed Change in Educational Program," in which it did nothing more than fill in a blank indicating that Christopher was to be transferred from Kingsbury to Coolidge, check

---

**9.** Because Kingsbury was no longer available, the distinction between *refusing* a request for a change in placement and *proposing* a change is somewhat academic in this case; even if DCPS had chosen to treat its disagreement with the proposed placement as a refusal to initiate a change, it would have been obligated to provide a new placement. That placement, however, would have been in a program similar to Kingsbury, such as the Chelsea School in Silver Spring, Maryland. Such an approach would have been much more consistent with DCPS' strategy of merely relying on evidence relating to Christopher's performance at Kingsbury in an attempt to show the inappropriateness of a residential placement, instead of affirmatively demonstrating the appropriateness of the Coolidge placement. *See* Bartlett, *The Role of Cost in Educational Decisionmaking for the Handicapped Child*, 48 LAW & CONTEMP.PROBS. 7, 52–55 (1985) (discussing burden of proof in EAHCA review proceedings).

**10.** Our point is *not* that special education programs in public schools are less likely to provide appropriate educational services. Rather, we emphasize only that given the circumstances of this case and the significance of the proposed change, it was particularly important that DCPS fully comply with the Act's requirements.

off a cursory and essentially meaningless standardized description of a "Learning Center," [11] and conclude with boilerplate language stating: "The proposed program is based on a review of all available assessment data, student observation, consultation with other professionals, discussion with parents or guardians resulting in the attached detailed Individualized Educational Program (IEP)." R.E., Plaintiff's Exhibit 24.

The notice did not describe options, if any, considered by DCPS or explain why such options were rejected, nor did it describe the "evaluation procedure[s], test[s], record[s], or report[s]," or any other factor upon which DCPS based its proposal. 34 C.F.R. § 300.505. Moreover, as testimony at the subsequent due process hearing and trial indicated, the boilerplate conclusion was inaccurate in several important respects: DCPS' only contact with Christopher was the one hour meeting with Mr. Mabry; DCPS had no meaningful contact with either Christopher's parents or teachers; and Christopher's IEP contradicted, not supported, the proposed change. In short, it is impossible to discern from DCPS' actions the kind of individualized consideration of a handicapped child's "unique needs," *Rowley*, 458 U.S. at 181, 102 S.Ct. at 3038, which Congress intended.

The Smiths predictably objected to the proposed placement at Coolidge and requested a due process hearing. Pursuant to the EAHCA's "status quo" provision,[12] DCPS was therefore obligated to maintain Christopher in his then current educational placement pending outcome of the review proceedings. Because his current placement, Kingsbury, was no longer available,[13] DCPS was obligated to locate and arrange a placement in a similar program—a day program in a private special education facility.

DCPS made no effort to provide a placement similar to Kingsbury. It argues that such an effort would have been futile because the Smiths had already signed a contract at Vanguard for the 1982–83 school year. As the district court stated, however, that fact "did not prevent DCPS from pursuing [the Coolidge placement]." *Smith v. McKenzie*, No. 83–156, Memorandum Op. at 11 (D.D.C. April 27, 1983). Moreover, on January 13, 1983, five months after its notice of proposed change in placement, and one week after it had filed suit challenging the hearing officer's determination, DCPS wrote to the Smiths and offered to place Christopher at Chelsea School in Silver Spring, Maryland, during the pendency of the proceedings. In response to inquiries from the Smiths' counsel, officials at Chelsea School stated that they had never heard of Christopher.

Given DCPS' noncompliance with the Act's procedural requirements and its concomitant failure to demonstrate serious consideration of Christopher's individual needs, it is not surprising that both the hearing officer and district court found that the placement proposed by DCPS was not appropriate. At the due process hearing, DCPS and the Smiths each presented two witnesses and submitted five reports on Christopher's educational and emotional needs. Based on the testimony and documentary evidence, the hearing officer found that the proposed placement at Coolidge would create a "potentially explosive ... emotional situation," particularly given that Christopher had always been educated in a restrictive environment. R.E., Hear-

11. The form contained the following description: "On site special education program in a regular education setting. Students are assigned to special education and receive at least 25% of their academic skills instruction program in regular education with time in the learning center determined in days or half days." R.E., Plaintiff's Exhibit 24.

12. "During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child...." 20 U.S.C. § 1415(e)(3).

13. Although DCPS in its pretrial statement took the position that Christopher had one more year to complete at Kingsbury, it conceded at trial that the child could not return to that school. *See Smith v. McKenzie*, No. 83–156, Memorandum Op. at 5 (D.D.C. Apr. 27, 1983).

ing Officer's Determination at 6. The hearing officer further found that Christopher was multihandicapped and needed a residential placement.

In its appeal to the district court, DCPS focused entirely on attempting to prove the inappropriateness of the hearing officer's residential placement determination and totally neglected its obligation under the EAHCA to demonstrate that it could provide an appropriate placement for the child. Indeed, DCPS "presented *no evidence* in support" of its proposed placement, Memorandum Op. at 5 (emphasis added), despite the fact that it specifically sought an order placing Christopher at Coolidge. Thus, the district court's finding that DCPS "failed to establish that the Coolidge Senior High School Learning Disabilities Center ... [was an] appropriate placement[] for the 1982–83 school year," *id.* at 11, is unassailable on appeal.[14]

### B. The Residential Placement

Upon finding that DCPS had failed to provide an appropriate placement for Christopher, it remained for the district court to determine what relief was appropriate. 20 U.S.C. § 1415(e)(2). The Smiths' basic position, with which the hearing officer agreed, was that because of the effect of increasing emotional problems, Christopher could not benefit educationally without a residential program. DCPS contended that a residential placement was inappropriate because Christopher had made progress in his then current placement, Kingsbury, and because a residential placement was inconsistent with the mainstreaming provisions

of the EAHCA. DCPS renews those arguments on appeal.

It is true, as DCPS points out, that the EAHCA does not require "that States maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042. *See also Lunceford v. District of Columbia Board of Education*, 745 F.2d 1577, 1583 (D.C.Cir.1984) ("The EAHCA does not secure the *best* education money can buy; it calls upon government, more modestly, to provide an *appropriate* education for each child.") (emphasis in original). It is further true that the Act expressly provides that handicapped children should be placed in the least restrictive placement appropriate to their individual needs. *See* 20 U.S.C. § 1412(5)(B); 34 C.F.R. §§ 300.550–556. It is equally clear, however, that the Act provides for residential placement and that such a placement may be necessary to meet the individual needs of a handicapped child. *See* 20 U.S.C. §§ 1401(16), 1413(a)(4)(B); 34 C.F.R. §§ 300.302, 551. To determine whether a residential placement is appropriate, a court must analyze "whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." *Kruelle v. New Castle County School District*, 642 F.2d 687, 693 (3d Cir.1981).[15]

In support of its argument that Christopher did not need a residential placement, DCPS relies on statements in his IEP indicating that he had made some educational progress at Kingsbury. There

---

**14.** DCPS essentially concedes this point. As it has throughout this case, DCPS on appeal focuses entirely on the residential placement issue. Indeed, it incredulously states that the appropriateness of its proposed placement at Coolidge is "irrelevant." Reply Brief for Appellant at 3. Had DCPS been more concerned with meeting its obligations under the EAHCA and less concerned with proving the inappropriateness of the placement desired by Christopher's teachers and parents, perhaps the outcome of this case— both below and in this court—would be different. *Cf. Ahern v. Keene*, 593 F.Supp. 902, 915 (D.Del.1984) ("[T]he School District has con-

sidered [the child's] unique needs and has met its burden of proving by a preponderance of the evidence that it has programs to implement the ... objectives of ... [the child's] IEP.").

**15.** *See generally* Wegner, *Variations on a Theme—The Concept of Equal Educational Opportunity and Programming Decisions Under the Education For All Handicapped Children Act of 1975*, 48 Law & Contemp.Probs. 169 (1985); Note, *Resolving Placement and Financing Disputes Under the Education For All Handicapped Children Act of 1975*, 62 Wash.U.L.Q. 763 (1985).

was conflicting evidence in the administrative record and at trial concerning the extent of Christopher's handicaps, and the effect of those handicaps on his educational performance.[16] Among this evidence was that relating to Christopher's performance at both Kingsbury and Vanguard. The district court considered all of the evidence as well as the various witnesses' knowledge of Christopher's individual needs. The court found that neither of DCPS' two primary witnesses at trial "had met Chris or his parents, and neither had any personal knowledge of the child," and both witnesses "admitted that they had not viewed all of the files and reports relating to Chris." Memorandum Op. at 6. In contrast, the witnesses called by the Smiths "were thoroughly familiar with the records and reports covering Chris and had personally interviewed and observed him over a lengthy period of time." *Id.* at 7. The court determined that based on the preponderance of the evidence Christopher's educational and emotional needs could not be segregated, and that a residential placement was therefore appropriate.[17] Although the evidence could also support a contrary conclusion, we cannot say that the district court's factual findings were clearly erroneous. *See Colin K. v. Schmidt,* 715 F.2d 1, 6 (1st Cir.1983).

■ We further decline to hold that the relief granted by the district court was wrong as a matter of law. The EAHCA, by directing the reviewing court to "grant such relief as [it] determines is appropriate," 20 U.S.C. § 1415(e)(2), "confers broad discretion on the court." *Burlington School Committee v. Department of Edu-*cation, —— U.S. ——, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985). This case was tried in April of 1983 when the school year at issue was nearly over. DCPS had failed at every stage in the proceedings to comply with, or even realize, its obligations under the EAHCA. The district court found that while Vanguard School was "not ... the perfect program for Chris, it [was] the best ... offered by either DCPS or the parents." Memorandum Op. at 8. Thus, the court acted within its discretion when it ordered placement in the only program supported by any evidence in the record.[18]

## C. *Reimbursement and Attorney Fees*

The parties also dispute the propriety of those aspects of the district court's order requiring DCPS to reimburse the Smiths for the costs of sending Christopher to Vanguard and awarding them attorney fees. These issues are easily disposed of in light of two recent Supreme Court decisions.

■ In *Burlington School Committee v. Department of Education,* the Supreme Court held that "by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." 105 S.Ct. at 2003. The district court in this case recognized that when the Smiths unilaterally placed Christopher at Vanguard, they did so at their own risk. The court found, however, that the Smiths acted in good faith, that the Vanguard placement was appropriate, and that DCPS was largely responsible for the

---

**16.** The primary dispute centered on the extent and effect of Christopher's emotional problems. The hearing officer determined that Christopher is "seriously emotionally disturbed." *See* 34 C.F.R. § 300.5(b). DCPS disputed that determination, but the district court held that DCPS failed to prove it was erroneous.

**17.** In considering the evidence, the reviewing court must give "due weight" to the expertise of the school officials responsible for providing the child's education. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. Where there is no indication that the school officials' expertise has been brought to bear on the individual needs of the handicapped child, however, the deference granted will be commensurately lower. *See Davis v. District of Columbia Board of Education,* 522 F.Supp. 1102, 1109 (D.D.C.1981).

**18.** For the reasons expressed in the text, we also reject DCPS' argument that even if Christopher needed a residential placement, Vanguard was not an appropriate placement.

delay in review proceedings. The district court's order granting the Smiths reimbursement was therefore proper.

■ The EAHCA does not provide for attorney fees. In *Smith v. Robinson,* ── U.S. ──, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Supreme Court held that litigants and courts cannot rely on either 42 U.S.C. § 1988 or section 505 of the Rehabilitation Act, 29 U.S.C. § 794a(b), to support attorney fees awards in EAHCA review proceedings. In the present case, although the district court did not specify the basis for awarding attorney fees, it is clear from a review of the Smiths' counterclaim that their request for fees was based on 42 U.S.C. § 1988 and 29 U.S.C. § 794a(b). In light of *Smith v. Robinson,* therefore, we must vacate that portion of the district court's order awarding attorney fees.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's determination that DCPS failed to provide an appropriate placement for Christopher. Although the EAHCA's clear requirement that handicapped children be educated in the least restrictive environment gives us pause, based on the particular circumstances of this case, we also affirm the court's order placing the child at Vanguard School for the 1982–83 school year and granting the Smiths reimbursement. We vacate that portion of the order awarding the Smiths attorney fees.

*So ordered.*