The Honorable Jodie Mahony State Representative 406 Armstrong Building El Dorado, Arkansas 71730
Dear Representative Mahony:
This is in response to your request for an opinion concerning the educational rights of handicapped preschoolers, and how those rights might be affected by a provision of a contract to be entered into between the Division of Developmental Disabilities Services ("DDS") of the Department of Human Services ("DHS"), and local community-based programs providing services to handicapped preschoolers.
Specifically, you have noted that the proposed contract in Section "O" states as follows:
 The Contractor further understands and agrees that in the event that DHS determines that State General Revenues are insufficient for Title XIX match that the Contractor will be given the choice of 1) Choose to no longer accept Medicaid eligible persons. 2) Continue to accept Medicaid eligible patients but not bill Medicaid and absorb the cost.
You then note that "preschool-aged children served by community-based programs are guaranteed the same legal protections under P.L. 94-142 as are children with handicapping conditions served through the public schools." You also note that P.L. 94-142 states in Section 4(a)(18) that children must receive special education and related services which "are provided in conformity with the individualized education program [I.E.P.] required under Section 614 (a)(5)", and that the I.E.P. must include a statement of specific educational services to be provided to such child, and the projected initiation and anticipated duration of such services.
Your question, relative to the above, is whether the individualized plan which is developed for each child is a binding contract, and if so, whether the option in the DDS contract to cease services contravenes a child's legal right to receive services outlined in his or her individualized plan. You also ask whether the community boards should sign or refuse to sign the DDS contract.
Some explanation is necessary before we attempt to answer the questions you have posed. Public Law 94-142, as you refer to it, is known as the "Education for All Handicapped Children Act of 1975" ("the act"), and is codified at 20 U.S.C. § 1400
et seq. It required states to provide a "free appropriate public education" or "FAPE" to certain handicapped children. Federal grant funds are made available to assist states in this responsibility. Under the act, states must provide a "FAPE" to:
 . . . all handicapped children between the ages of three and eighteen within the State not later than September 1, 1978, and for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980, except that, with respect to handicapped children aged three to five and aged eighteen to twenty-one, inclusive, the requirements of this clause shall not be applied in any State if the application of such requirements would be inconsistent with State law or practice, or the order of any courts, respecting public education within such age groups in the State.
20 U.S.C. § 1412 (2)(B).
The act was amended, however, in 1986 with regard to handicapped children aged 3-5: This change is summed up by the following passage:
 With the passage of the Education of the Handicapped Amendments Act of 1986, Congress provided strong incentives for states to serve three to five year old children. [See Public Law 99-457] If states do not serve these children, they will lose funds appropriated for the preschool programs and will not be allowed to count three to five year old children under the basic grant.
School Law Yearbook (1987) at 119.
In response to these amendments, our Arkansas legislature amended A.C.A. 6-41-203, which formerly defined a "handicapped child" as one age five to twenty-one, to provide as follows:
 (1) Prior to July 1, 1991, "Handicapped child" means a person between the ages of five (5) and twenty-one (21) years who because of mental, physical, emotional, or learning disabilities requires special education services as defined by State Board of Education regulations. After July 1, 1991, "handicapped child" means a person between the ages of three (3) and twenty-one (21) years who, because of mental, physical, emotional, or learning service as defined by State Board of Education regulations. Should federal law mandate services for three (3) to five (5) year age group prior to July 1, 1991, this section will follow federal time lines.
A.C.A. 6-41-203 (Supp. 1989).
The July 1, 1991 date refers to the beginning of the 1991 fiscal year. States must have a state law in place by that date assuring a "FAPE" to preschoolers aged three to five in order to retain federal funding. See 20 U.S.C. § 1419(b).
Your opinion request specifically mentions the rights of preschoolers under the act. We have thus set out the above provisions relative to preschoolers. It appears that currently, (as of July 1990) the State of Arkansas is not required by law to provide a "FAPE" to preschoolers (aged 3-5), but it will be required by Arkansas law beginning July 1, 1991. Notwithstanding this fact, it is our understanding that the state is currently providing services to some preschoolers on a permissive "phase-in" basis, and is receiving federal incentive money under 20 U.S.C. § 1419. Thus, the state is not currently required by law to provide services to preschoolers aged 3-5, but is currently providing services to identified handicapped preschoolers on a permissive basis. Once services are provided to a particular child, however, it appears that the state is then required to provide a "FAPE" to that particular child. The requirement is found at Code of Federal Regulations 300.300 (b)(4), which provides as follows:
 (b) Age ranges 3-5 and 18-21. This paragraph provides rules for applying the requirement in paragraph (a) of this section to handicapped children aged three, four, five, eighteen, nineteen, twenty, and twenty-one:
* * *
 (4) If a public agency provides education to a handicapped child in any of these age groups, it must make a free appropriate public education available to that child and provide that child and his or her parents all of the rights under Part B of the Act and this part.
See also Senate Report No. 94-168 p. 19 (1975).
One of the rights to which a handicapped child is entitled under the act is the development of an individualized education program or "I.E.P." That term is defined at20 U.S.C. § 1401 (19) (Cum. Supp. May, 1990) as follows:
 The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and whenever appropriate, such child, which statement shall include —
 (A) a statement of the present levels of educational performance of such child,
 (B) a statement of annual goals, including short-term instructional objectives,
 (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational program,
 (D) the projected date for initiation and anticipated duration of such services, and
 (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
Now that we have provided some background on the issue of handicapped preschoolers' educational rights, we must provide some background information on the other area of your question which involves Title XIX funding. Title XIX appears at 42 U.S.C. § 1396 et seq. and is entitled "GRANTS TO STATES FOR MEDICAL ASSISTANCE PROGRAMS". This title provides federal grants for medical assistance and is referred to as "Medicaid". Some of the services required by handicapped preschoolers are covered by Medicaid funding. These services may at times overlap with the "FAPE" and related services required under the "Education for All Handicapped Children Act". Thus, it appears that Medicaid or "Title XIX" funds may be available to some community based programs providing services to handicapped preschoolers. This is apparently why the DDS contract to which you refer contains Section "O" relating to Title XIX funding shortages. [We should note here that there are other statutory provisions regarding the various funding avenues available to states providing services to handicapped children. The various state agencies providing services to handicapped children may enter into interagency agreements relative to funding, (See U.S.C. § 1413 (e) and C.F.R. 300.589). These considerations are, however, too complex and would involve too many factual considerations to review at length in this format. We will thus accept as a general premise that Medicaid funding is available for some of the services required under the act, (see Louisiana Opinion No. 89-398) and will not delve further into funding issues.]
With this background information in mind, we may now begin to answer your question, which is whether the "IEP" developed for each preschool child is a "binding contract", and if so, whether the DDS contract provision, (Section O), which contemplates the cessation of services, contravenes a child's legal right to receive services. For the reasons that follow, it is my opinion that the "IEP" developed for each child is not in the classic sense "a binding contract" but that nonetheless, the child may have a "legal right" or entitlement to receive the services outlined in his or her "IEP". This conclusion, however, does not mean that the child must be served solely through the use of Title XIX funds. or through any particular community-based program, including the program in which the child is currently placed.
It is my opinion that the IEP. developed for a preschooler is not, in the truest sense, a "contract". The essential elements of a contract are competent parties, subject matter, legal consideration, mutual agreement, and mutual obligations. Moss v. Allstate Insurance Co., 29 Ark. App. 33,776 S.W.2d 831 (Ark.App. 1989). In my opinion, the "I.E.P." is not in the nature of a "contract", primarily because consideration is absent. The child is entitled under the law to receive a "FAPE" free of charge. Additionally, the element of mutual agreement may in some instances be missing. See e.g. C.F.R. 300.504 governing evaluation and initial placement of a child without parental consent.
The "legal right" of the child is more in the nature of an entitlement. We know that a preschool handicapped child who currently has an I.E.P. is entitled under C.F.R. 300.300 (b)(4) to receive a FAPE and all of the procedural rights accorded under the act. To this extent, the state is required to fund this child's educational process. See generally, Opinion No. 77-89, copy enclosed. The state is not required, however, to provide this education exclusively through the use of Medicaid funds, or to maintain the child in his current educational placement. Thus, Section "O" of the DDS contract does not contravene a child's legal right to receive services, unless as a result thereof, the child is entirely denied a FAPE or is denied any of the procedural rights to which he is entitled. Certain procedural safeguards must be accorded, if indeed a true change in "educational placement" has occurred. If, for example, Medicaid funding is lost and a particular community-based organization can no longer serve that child, the state is still required to provide a "FAPE" to that child, and this change of facility encompasses significant changes in the child's general educational program, such that a "change in educational placement" has occurred, then the parents or guardian(s) are entitled to notice and possibly a full hearing on the issue. 20 U.S.C. § 1415 (b). See also Lunceford v. District of Columbia Board of Education,745 F.2d 1577 (D.C. Cir. 1984) and Tilton, by Richards v. Jefferson County Board of Education, 705 F.2d 800 (6th Cir. 1983). Additionally, unless the state or local authority and the parents or guardian otherwise agree, the child is to remain in his then-current educational placement during the pendency of the proceedings. 20 U.S.C. § 12525 (e)(3). This provision, however, has been held inapplicable to changes in educational placements occasioned by budgetary problems. See Tilton, supra.
Thus, in response to your question, it is my opinion that although a preschool handicapped child's I.E.P. is not a "contract" in its usual sense, such children who currently have I.E.P.s are entitled to receive a "free appropriate public education" and all of the procedural rights accorded under the "Education for All Handicapped Children Act of 1975". The DDS contractual provision to which you refer does not contravene these rights as long as the child receives the services outlined in his or her I.E.P., [see C.F.R. 300.346, Appendix C, No. 45 and A.C.A. 6-41-20(b) (Supp. 1989)], through a qualified provider, (even though a change in educational placement may occur), and is accorded all of the applicable procedural rights during this process, and as long as the services are provided free of charge to the child.
With respect to your final question, which is whether the community-based programs should sign or refuse to sign the contract, we must note that this is a decision for each of them to make, with the advice of their regular counsel.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elana L. Cunningham.
Sincerely,
RON FIELDS Attorney General
RF:arb