501 A.2d 1 (1985)
In re Margaret BICKSLER, Appellant.
DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES, Appellant,
v.
Margaret BICKSLER, Appellee.
Nos. 83-957, 83-1143.
District of Columbia Court of Appeals.
Argued December 19, 1984.
Decided November 20, 1985.
Bruce B. Vignery, Washington, D.C., with whom Ellis Birnbaum was on the brief, for Margaret Bicksler, appellant in No. 83-957 and appellee in No. 83-1143.
Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia Dept. of Human Services, appellee in No. 83-957 and appellant in No. 83-1143.
Richard M. Sharp, with whom William R. Hanlon, Washington, D.C., was on the brief, amicus curiae appointed by this court.
Martha E. Ford and Donna Wulkan, with Brad Johnson, law student counsel, Washington, D.C., filed a brief for amici curiae, District of Columbia Ass'n for Retarded Citizens and Antioch School of Law.
Before MACK, NEWMAN, and TERRY, Associate Judges.
TERRY, Associate Judge:
Margaret Bicksler and the District of Columbia Department of Human Services (hereafter "the District") both seek review of an order of the Superior Court discharging Miss Bicksler from her commitment *2 to Forest Haven, an institution for mentally retarded citizens owned and operated by the District of Columbia. Both appellants contend, for somewhat different reasons, that Miss Bicksler is in need of residential services and is entitled to remain committed to Forest Haven. We conclude that the trial court properly terminated her commitment, but we hold that because of Miss Bicksler's continued need for residential services, the District must grant her request for voluntary admission and provide her with the living arrangement that she needs.

I
Margaret Bicksler was born in 1948. She lived at home with her mother, her brother, and an adopted brother until she was nine. Her mother has been diagnosed as severely retarded and is currently in a nursing home. Her brother is also retarded and now lives in a group home supervised by Forest Haven. Her paternity has never been established, and the record contains no information about her adopted brother.
At age nine Miss Bicksler was placed in Junior Village, a residential facility for children operated by the District. Her convulsive epileptic seizures caused her to be transferred to the District of Columbia General Hospital, however, and from there she was sent to live in a foster home. Her time in the foster home was brief; her seizures once again sent her back to the hospital. She was then placed in the Partridge School, where she remained from 1960 to 1966.
In 1966, when she was eighteen, Miss Bicksler was diagnosed as being mildly mentally retarded and committed to the District Training School, now known as Forest Haven. She has remained there ever since, except for a few months in 1981 when she lived in a group home for emotionally disturbed women. She was returned from that home to Forest Haven because of medical and behavioral problems.
In addition to her mental disability, Miss Bicksler has several physical afflictions. She is blind in her right eye, has scoliosis of the spine, and suffers from heart disease and epilepsy. This last disability is the most hampering; it resulted in her being sent back to Forest Haven in 1981 and plagued her when she was younger by often causing her temporary transfer from a residence to a hospital. Although she is capable of performing some basic tasks, she is not able to take care of herself; some form of supervised living arrangement has been consistently recommended for her by doctors and other persons involved in her care.
In June 1981 the District filed a motion pursuant to D.C. Code § 6-1985 (1981),[1] requesting the Superior Court to review Miss Bicksler's commitment. The District also asked the court to order her commitment to be continued until proper community living arrangements could be made for her.
An initial review hearing was held shortly thereafter by a Superior Court hearing commissioner, who made the following entry on the court docket:
Initial Hearing. All parties present. Ms. Bicksler is found to be mildly mentally retarded; to not be competent to refuse commitment or request discharge; to have benefited from the habilitation provided for her; and to be in need of further residential habilitation. Counsel are to submit memoranda of law concerning question of Ms. Bicksler's legal status. Further evaluations also to be submitted by D.H.S. [Department of Human Services]. Memoranda to be submitted on or before August 1, 1981.
A judge of the Superior Court issued an order incorporating the findings of the hearing commissioner, and appointing an amicus curiae to assist the court in sorting out the legal issues involved. The amicus *3 and the parties filed memoranda of law, each concluding that Miss Bicksler should continue to receive residential habilitation.[2] The court heard oral argument on the legal issues in December 1981 and took the case under advisement.
In May 1982 a revised habilitation plan was issued for Miss Bicksler, and a few months later the hearing commissioner held a hearing to review it. Once again he found that Miss Bicksler was mildly mentally retarded, that she had benefited from her treatment, and that she was in need of continued residential habilitation. He ruled that she met the requirements of D.C. Code §§ 6-1951[3] and 6-1985 and therefore recommended that her commitment be continued.
On July 29, 1983, the court issued a thirty-page opinion and order directing that Miss Bicksler be discharged from Forest Haven. In essence, the court ruled that the District of Columbia Rights of Mentally Retarded Citizens Act, D.C. Code §§ 6-1901 through 6-1985 (1981) ("the Act"), required it to review the commitment of all current residents of Forest Haven; that the review should be treated as if it were an initial commitment hearing; that under the Act only persons who are "at least moderately mentally retarded" may be committed; and that because Miss Bicksler was only mildly retarded,[4] she must therefore be discharged from her commitment. Because the court found that Miss Bicksler had a continuing need for treatment, however, it ordered the District to make suitable arrangements for her non-residential habilitation.
The District then filed a motion to clarify and amend the order under Super.Ct.Civ.R. 59(e); Miss Bicksler and the amicus curiae joined in the motion. The court modified its order by ruling that the District had no further obligation to provide any kind of service to Miss Bicksler. The trial court's order has been stayed pending the outcome of these appeals.

II
The first issue presented for us to decide is whether Miss Bicksler may continue her commitment under the Act. The trial court held that D.C. Code § 6-1924 (1981) governs this case and mandates that she be discharged from her commitment because she is not "at least moderately mentally retarded." Miss Bicksler contends, however, that D.C. Code § 6-1951 (1981) applies and requires that her commitment be continued, since she has benefited from her habilitation and continues to need residential habilitation. We hold that both statutes apply, and that they mandate that Miss Bicksler's commitment be terminated.
The Rights of Mentally Retarded Citizens Act was enacted in 1978. D.C. Law 2-137, 25 D.C.Reg. 5094 (1978). It was designed, in part, to "[a]ssure that mentally retarded persons shall have all the civil and legal rights enjoyed by all other citizens. . . ." D.C. Code § 6-1901(a)(1) (1981). In subchapters III and IV the Act sets forth the procedural rights of mentally retarded citizens, and in subchapter V it declares their substantive rights.
*4 The Act contains only one section which deals expressly with the rights of those persons who, like Miss Bicksler, were residing in Forest Haven at the time it was enacted. D.C. Code § 6-1985 (1981) provides:
This chapter shall take effect pursuant to the provisions of § 1-233(c)(1). With respect to persons who are residents in facilities on the effective date of this chapter, the provisions of the chapter will take effect immediately, with the exception of the admission and commitment hearing procedures established in subchapters III and IV of this chapter. The Court shall begin hearings under subchapters III and IV of this chapter to review the commitment of such persons, and shall appoint appropriate officers to review the admission of such persons, as soon as possible, but not later than 180 days after the effective date of this chapter. All Court hearings to review the admission or commitment of persons residing in facilities on the effective date of this chapter shall be completed within three years of the effective date of this chapter.
The controversy in the present case results from the failure of section 6-1985 to state exactly which provisions of subchapters III and IV apply to those persons residing in facilities at the time the Act became effective.[5]
Miss Bicksler contends that section 6-1951 was intended to apply, and we agree. The mandate of section 6-1985 is to "review the commitment" of all existing residents, and section 6-1951 deals expressly with the "[p]eriodic review of commitment order[s]." The relationship between the two sections is obvious, and because no persuasive reason has been advanced for holding section 6-1951 inapplicable, we hold that it applies in the present case.[6] Section 6-1951 provides:
(a) Any decision of the Court ordering commitment of a mentally retarded person to a facility shall be reviewed in a Court hearing every six months for two years, and once a year thereafter. The mentally retarded individual shall be discharged unless there is a finding of the following:
(1) The Court determines that the mentally retarded individual has benefited from the habilitation; and
(2) The facility, its sponsoring agency or the Department of Human Services demonstrates that continued residential habilitation is necessary for the habilitation program.
(b) If a mentally retarded individual is discharged in accordance with the provisions of subsection (a)(1) of this section but continues to evidence the need for habilitation and care, it shall be the responsibility of the Department of Human Services to arrange for suitable services for the person.
We also agree with the trial court that section 6-1924 should play a role in the review of the commitments of persons residing in Forest Haven at the time the Act was passed. Section 6-1924 provides:
(a) A written petition by a parent or guardian may be filed with the Court to have an individual fourteen years of age *5 or older, who is or is believed to be mentally retarded, committed to a facility. Upon the filing of such petition, the Court shall promptly conduct a hearing in accordance with the procedures set forth in subchapter IV of this chapter. If the Court determines that the individual is competent to refuse such commitment and the individual so refuses, the Court shall dismiss the petition and order that the individual not be committed to a facility.
(b) If the Court determines that the individual is not competent to refuse commitment, the Court shall determine whether to order the commitment. The Court shall order the commitment only if it determines beyond a reasonable doubt that:
(1) Based on a comprehensive evaluation of the individual performed within six months prior to the hearing, the individual is at least moderately mentally retarded and requires habilitation;
(2) Commitment to a facility is necessary in order for the individual to receive the habilitation indicated by the individual habilitation plan required and defined under § 6-1943;
(3) The facility to which commitment is sought, its sponsoring agency, or the Department of Human Services is capable of providing the required habilitation; and
(4) Commitment to that facility would be the least restrictive means of providing the habilitation.
(c) The facility, its sponsoring agency, or the Department of Human Services shall provide a written certification to the Court, before commitment to the facility is ordered, that the habilitation indicated by the individual habilitation plan will be implemented.
A quick comparison of section 6-1924 with section 6-1951 reveals that the former provision confers on retarded persons several important rights not provided by the latter. Most relevant to the instant case is the right not to be involuntarily committed unless a court finds beyond a reasonable doubt that the individual is "at least moderately mentally retarded." D.C. Code § 6-1924(b)(1) (1981). This shields approximately 89 percent of all mentally retarded citizens from being involuntarily committed.[7] This right, like all the others provided to mentally disabled persons under the Act, was intended to be afforded to all such persons, not just to those who were committed after the effective date of the Act. That is made clear by section 6-1985, which provides in pertinent part: "With respect to persons who are residents in facilities on the effective date of this chapter [i.e., the entire Act], the provisions of the chapter will taken effect immediately. . . ."[8]See People ex rel. Kaminstein v. Brooklyn State Hospital, 49 Misc.2d 57, 266 N.Y. S.2d 916 (N.Y.Sup.Ct.1966) (newly enacted mental health act held to apply to those persons committed before its enactment in order to afford them all of the rights provided by the new legislation); cf. McCree v. McCree, 464 A.2d 922, 926 (D.C.1983) (property distribution statute held to apply to marriages which occurred prior to its enactment; to hold otherwise would place "one generation of married persons at a potential disadvantage in comparison with later generations" and would fail to correct for the earlier generation the evil which the statute sought to eliminate).
Therefore, we reject Miss Bicksler's argument that we must view section 6-1951 in isolation and apply it to the exclusion of section 6-1924. Our conclusion is *6 supported by the well-established principle that statutory provisions must be construed together with related provisions and not in isolation. Carey v. Crane Service Co., 457 A.2d 1102, 1108 (D.C.1983); Howard v. Riggs National Bank, 432 A.2d 701, 709 (D.C.1981); Citizens Ass'n of Georgetown v. Zoning Commission, 392 A.2d 1027, 1033 (D.C.1978) (en banc); 2A SUTHERLAND, STATUTORY CONSTRUCTION § 46.05 (4th ed.1984). "This is particularly true where [the application of] different provisions within the same statute would produce inconsistent results." Howard v. Riggs National Bank, supra, 432 A.2d at 709. In this case, since the trial court found that Miss Bicksler had benefited from the habilitation she had received and was in need of continued residential habilitation, but was not at least moderately mentally retarded, the separate application of sections 6-1924 and 6-1951 would produce inconsistent results; hence we construe them together. Reading section 6-1951 in light of section 6-1924, we hold that Miss Bicksler's commitment must be terminated because she is not "at least moderately mentally retarded."

III
Appellant Bicksler contends that if we hold that her commitment must end, we will deprive her of much-needed residential habilitation. She asserts that the Act provides only two means by which a person may obtain residential habilitation, involuntary commitment and voluntary admission, and that both avenues are now closed to her. She notes that the word "admission" is defined by the Act only in terms of "an individual who is at least moderately mentally retarded. . . ." D.C. Code § 6-1902(1) (1981). Since she is only mildly retarded, she fears, she may not be voluntarily admitted to a residential facility. We hold, however, that the inclusion of the words "at least moderately mentally retarded" in the definition of "admission" was an oversight by the City Council, and that voluntary admissions are available to mentally retarded persons regardless of their degree of retardation.
The Act provides that "[a]ny individual. . . who is . . . diagnosed mentally retarded may apply . . . for voluntary admission. . . ." D.C. Code § 6-1922(a) (1981). The term "mentally retarded" is defined in the Act, and its definition differs from that of "at least moderately mentally retarded," which is also defined in the Act. Compare D.C. Code § 6-1902(19) with § 6-1902(2). Therefore, the definition of "admission" which refers to "an individual who is at least moderately mentally retarded," in section 6-1902(1), is in direct conflict with the substantive provision regarding admissions, section 6-1922(a), which authorizes the admission of anyone who is merely "mentally retarded." We shall resolve this conflict by looking to another related provision of the Act and by reviewing the relevant legislative history.
As we have said, statutory provisions must be construed not in isolation but in combination with other related provisions. E.g., Howard v. Riggs National Bank, supra, 432 A.2d at 709. In this instance the most relevant related provision is D.C. Code § 6-1961(a) (1981), which provides:
All mentally retarded persons have a right to habilitation and care suited to their needs, regardless of age, degree of retardation or handicapping condition. [Emphasis added.]
Under the Act, there are only two ways in which a person in need of residential habilitation may obtain it: either by involuntary commitment under section 6-1924 or by voluntary admission under section 6-1922. Involuntary commitment, however, is not available unless the person is "at least moderately mentally retarded." D.C. Code § 6-1924(b)(1). Therefore, since section 6-1961(a) guarantees to all mentally retarded persons the care they need "regardless of. . . [their] degree of retardation," those who need residential habilitation but are not "at least moderately mentally retarded" must obtain it through voluntary admission under D.C. Code § 6-1922. In order *7 to give effect to the plain meaning of section 6-1922(a), which provides that "[a]ny individual . . . who is . . . mentally retarded may apply . . . for voluntary admission," we must read the language to the contrary out of section 6-1902(1).
We find support for this construction of the Act in its legislative history. An early version of what became section 6-1922 provided that voluntary admissions were to be limited to persons who were "at least moderately retarded." Draft of Bill No. 2-108, § 302(a) (May 4, 1978). The primary reason for imposing this limitation was to prevent the "voluntary" admission of individuals who are "coerced" by "parents [who] are . . . tired of taking care of them . . . into . . . saying they want to be admitted to an institution." Council of the District of Columbia, Committee on Human Resources and Aging, Proceedings of Roundtable Discussion (May 19, 1978).
While the bill was still in committee, a memorandum was circulated by Lee Partridge, the Staff Director of the Committee on Human Resources and Aging, on June 2, 1978. It contained a revised draft of section 302 which was nearly identical to the provision ultimately adopted by the Council and codified as section 6-1922. It dropped the "at least moderately retarded" language and, at the same time, satisfied the concern about the possibility of coerced admissions by providing for a post-admission determination of the voluntariness of the admission and the competency of the retarded person to admit himself or herself. Significantly, the final sentence of the Partridge memorandum stated that if this version of section 302 met with the Council's approval, "other sections of the bill will be modified as necessary to conform to the change." After a few minor amendments, section 302 was adopted, but the predicted changes were apparently never made; at least, no change was made in section 6-1902(1) to conform with section 6-1922. From this history we can only conclude that the presence of the phrase "at least moderately mentally retarded" in section 6-1902(1) as adopted was simply the result of an oversight by the Council, and that it does not reflect any intent on the part of the Council to restrict voluntary admissions to persons who are "at least moderately mentally retarded." Therefore we hold that a mentally retarded person who is in need of residential habilitation, but is not "at least moderately mentally retarded," may nevertheless obtain such habilitation through the voluntary admission procedures set forth in D.C.Code § 6-1922 (1981).
It follows that upon Miss Bicksler's filing of an application for admission pursuant to section 6-1922, she must be granted admission so long as her application is found to be voluntary.[9] The hearing commissioner and the court both found that Miss Bicksler had benefited from residential habilitation and was in need of further residential habilitation.[10] Section 6-1961(a) guarantees to "[a]ll mentally retarded persons . . . [the] right to habilitation and care suited to their needs, regardless of . . . [their] degree of retardation. . . ." Since Miss Bicksler is not "at least moderately mentally retarded," as she must be for an involuntary commitment under section 6-1924(b)(1), the only way in which she can obtain the residential habilitation she needs is through *8 voluntary admission; hence she must be granted admission if she asks for it.[11]
For these reasons we affirm the order of the trial court terminating Miss Bicksler's commitment. However, in order to prevent her from being left without her needed residential habilitation, we direct that the stay previously entered in this case remain in effect until she has been granted voluntary admission pursuant to D.C.Code § 6-1922 (1981).
We close this opinion with an expression of thanks to Richard M. Sharp, Esquire, a member of the law firm of Shea and Gardner, for accepting our appointment to serve as an amicus curiae on this appeal. Mr. Sharp has been of enormous assistance to the court in deciding this difficult and complex case. His performance has been in the highest traditions of the bar.
Affirmed.
NOTES
[1] See page 4, infra.
[2] D.C.Code § 6-1902(14) (1981) defines habilitation as follows:

"Habilitation" means the process by which a person is assisted to acquire and maintain those life skills which enable him or her to cope more effectively with the demands of his or her own person and of his or her own environment and to raise the level of his or her physical, intellectual, social, emotional and economic efficiency. "Habilitation" includes, but is not limited to, the provision of community-based services.
Residential habilitation means in-patient habilitation Cf. D.C.Code § 6-1923 (1981) (dealing with "out-patient non-residential habilitation").
[3] See page 4, infra.
[4] When Miss Bicksler was committed in 1966, any "feeble-minded" person could be committed. D.C.Code § 21-1103 (Supp. V, 1966). The standard was later changed to "substantially retarded." D.C.Code § 21-1103 (1973). The most recent amendment requires that the person be "at least moderately mentally retarded." D.C. Code § 6-1924 (1981).
[5] Subchapters III and IV contain three of the sections which are critical to our decision in this case. Sections 6-1922 and 6-1924 are in subchapter III, and section 6-1951 is in subchapter IV.
[6] The legislative history of the Act makes clear that section 6-1951 was intended to apply to those persons who were residents of Forest Haven at the time the Act took effect. During the discussions on what became section 6-1951, Vincent Gray, the Executive Director of the District of Columbia Association for Retarded Citizens, expressed his concern that by applying that provision "we'll have 900 retarded citizens [the existing population of Forest Haven] walking the streets doing nothing." Council of the District of Columbia, Committee on Human Resources and Aging, Proceedings of Roundtable Discussion (May 25, 1978). An amendment was later adopted, however, to prevent section 6-1951 from causing the "dumping" of the Forest Haven population into the streets. Council of the District of Columbia, Committee on Human Resources and Aging, Minutes of Regular Meeting (July 18, 1978).
[7] Of all persons deemed to be mentally retarded, 89 percent are mildly retarded, 6 percent are moderately retarded, and 5 percent are severely retarded. COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON HUMAN RESOURCES AND AGING, REPORT ON BILL No. 2-108, at 20 (July 20, 1981).
[8] The "admission and commitment hearing procedures" of subchapters III and IV, however, do not take effect immediately, but rather when the review of such proceedings occurs. D.C.Code § 6-1985 (1981). Since the review for Miss Bicksler has already been completed, all the provisions of the Act are now applicable to her.
[9] A determination of Miss Bicksler's competency to admit herself should also be made under section 6-1922(c). If she is found competent to admit herself, she must be granted admission. Even if she is found incompetent to admit herself, however, she must be admitted because her admission would be the "appropriate placement" under section 6-1922(c)(4), given her clear need for residential habilitation.

In light of our holding, we need not consider Miss Bicksler's other arguments based on the Equal Protection Clause and the doctrine of parens patriae.
[10] The hearing commissioner found Miss Bicksler "to have benefited from the habilitation provided for her . . . and to be in need of further residential habilitation." The court later adopted these findings as its own.
[11] We are aware that in Evans v. Washington, 459 F.Supp. 483, 488 (D.D.C.1978), the District Court ordered that "[t]here shall be no admissions to Forest Haven until further order of this Court." Although there has been no such order, Evans does not bar admission to a community environment or a group home supervised by Forest Haven. We were advised at oral argument that Miss Bicksler was at that time being placed in a group home. In any event, the Evans decision has been held to be inapplicable to those persons who, like Miss Bicksler, were living at Forest Haven at the time the decision was issued. Lunceford v. District of Columbia Board of Education, 241 U.S.App.D.C. 1, 7, 745 F.2d 1577, 1583 (1984).