# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued October 23, 2015          Decided March 8, 2016

No. 14-7168

KINGMAN PARK CIVIC ASSOCIATION,
APPELLANT

v.

MURIEL BOWSER, IN HER OFFICIAL CAPACITY AS MAYOR OF
THE DISTRICT OF COLUMBIA,
APPELLEE

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00990)

―――――

*Frazer Walton Jr.* argued the cause and filed the briefs for appellant.

*Jason H. Lederstein*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General. *Richard S. Love*, Assistant Attorney General, entered an appearance.

Before: BROWN and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Kingman Park Civic Association exists to protect and enhance Kingman Park and the surrounding neighborhood in Washington, D.C. It has successfully applied to the District's Historic Preservation Review Board to have the former Spingarn Senior High School designated a historic landmark. (The school was built in the mid-20th century for African American students, in one of the last gasps of de jure school segregation.) Next to Spingarn is Langston Terrace, a 13-acre public housing complex built in the 1930s as segregated housing for African Americans.

Over the last several years the District of Columbia has started to develop a 2.2-mile streetcar line centered on this neighborhood. It entails a "Car Barn" on the Spingarn campus in order to provide for storage and maintenance of the streetcars, plus space for training. We treat the streetcar program and the Car Barn collectively as "the Project."

The Association challenged the Project's construction in district court on a variety of grounds. In two Memorandum Opinions and Orders, the court rejected the claims in a medley of dismissals for failure to state a claim and summary judgment, both of which we review de novo. *Kingman Park Civic Association v. Gray*, 27 F. Supp. 3d 142 (D.D.C. 2014) ("*Kingman Park I*"); *Kingman Park Civic Association v. Gray*, 27 F. Supp. 3d 171 (D.D.C. 2014) ("*Kingman Park II*").

Three main challenges arise out of those rulings: (1) that the District's legislation (the "Wire Acts") authorizing construction of the overhead wires to supply the streetcars with power violated an 1888 federal statute; (2) that the D.C. Department of Consumer and Regulatory Affairs failed to

prepare an environmental impact statement ("EIS"), contrary to D.C. law; and (3) that the District's pursuit of the Project violated the Equal Protection Clause of the 14th Amendment to the U.S. Constitution (made applicable to the District through the Due Process Clause of the 5th Amendment). We address them in that order and affirm the judgment, though in certain cases on different grounds from those of the district court.

\* \* \*

*The Wire Acts.* To allow the construction of aerial wires to supply the streetcars with power, the City Council passed the "Wire Acts," Transportation Infrastructure Emergency Amendment Act of 2010, D.C. Act 18-486; Transportation Infrastructure Congressional Review Emergency Act of 2010, D.C. Act 18-583; Transportation Infrastructure Amendment Act of 2010, D.C. Act 18-684 (codified at D.C. Code § 9-1171(a) (2012)), in effect overturning a 1888 statute barring the District from authorizing "telegraph, telephone, electric lighting or other wires . . . on or over any of the [District's] streets or avenues." 25 Stat. 323 (1888) (codified at D.C. Code § 34-1901.01 (2012)). The Association complained that the Wire Acts violated the 1888 statute; their claim must surmount the Home Rule Act, which grants the City Council broad (but not unlimited) authority to pass laws governing the District. D.C. Code §§ 1-201.02(a), 1-206.02(a) (2012). The district court ruled that the Association did not have standing to challenge the District's authorization of overhead wires. We find standing, but reject the claim on the merits.

An association such as the plaintiff may establish standing by showing either an injury to itself ("organizational standing"), *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982), or a cognizable injury to one or more of its members, *Hunt v. Washington Apple Advertising Comm'n*,

4

432 U.S. 333, 342-43 (1977). The injury to members can establish "associational standing" so long as the member interests that the organization seeks to protect are germane to its purposes and neither the claim nor the relief requires the members' participation. *Id*. The district court rejected both theories, *Kingman Park I*, 27 F. Supp. 3d at 155-58; we confine ourselves to associational standing, which we find to have been established.

As the district court noted, two members of the Association (Murray and Wiggins) filed declarations saying that the wires would "adversely affect the clear and unobstructed views" of the Spingarn High School and the Langston Terrace, thus detracting from the aesthetic and recreational value of areas that their declarations say they use. *Kingman Park I*, 27 F. Supp. 3d at 156. These assertions are uncontested, and we see no reason to doubt that the overhead wires would have the effects stated and qualify as a concrete injury, traceable to the District's actions and remediable by an injunction against those actions. Vindication of the two members' interests is germane to the purpose of the Association, which the complaint describes as seeking "to preserve and protect the historic buildings, scenic views, integrity and environment within the District of Columbia and specifically, the Kingman Park neighborhood." *Id*. at 155. No reason appears why the members' participation in the lawsuit would be necessary. Associational standing thus exists for the challenge to the Wire Acts. As we will explain shortly, this reasoning also applies to standing on the EIS and equal protection issues.

On the merits of the Wire Acts claim, the Association misreads the Home Rule Act. That Act prohibits legislation by the Council "to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02(a)(3) (2012); the 1888

statute was "restricted" in exactly that way. Thus, especially taking into account the Home Rule Act's stated purpose—to "relieve Congress of the burden of legislating upon essentially local District matters," D.C. Code § 1-201.02(a) (2012)—the 1888 provision is no obstacle to the Wire Acts.

*Environmental Impact Statement*. The Association claims that the D.C. Department of Consumer and Regulatory Affairs improperly failed to prepare an environmental impact statement, in violation of the D.C. Environmental Policy Act, D.C. Code § 8-109.03(a) (2012). The Association identified a variety of harms that it said the District had inadequately considered, including increased car traffic, electromagnetic radiation from the overhead wires, noise, dust and particle pollution, and water pollution. The district court dismissed the EIS claim, in almost all instances on the ground that the Department's consideration of these issues, viewed in light of the Association's ill-substantiated assertions of more severe, unacknowledged harms, was not arbitrary, capricious, or an abuse of discretion, the undisputed standard of review. *Kingman Park II*, 27 F. Supp. 3d at 178-83. See also D.C. Code § 2-510(a)(3)(A) (2012); *In re A.T.*, 10 A.3d 127, 123-24 (D.C. 2010).

The parties agree that the Association has standing to raise the EIS issue (and also the equal protection issues discussed below). Although the district court found organizational standing, *Kingman Park II*, 27 F. Supp. 3d at 178-83, we think it simpler to rely on associational standing, in view of Association members' declarations as to their residence and use of the neighborhood and (in connection with the equal protection claim) their being African American. And there is no more problem here with regard to the second and third requirements of *Hunt* than there was for the Wire Acts claim.

We uphold the district court's dismissal of the EIS claim, but in part on different grounds. We begin by noting that the Association's EIS claim regarding electromagnetic radiation was waived because it was not raised in its Amended Complaint. *Kingman Park II*, 27 F. Supp. 3d at 179. Among the remaining arguments, we take here as an illustration the Association's strongest argument—the assertion of serious traffic impacts, particularly around the Spingarn site, where the streetcars would be stored; the other arguments are no better. The district court mistakenly dismissed this claim on the theory that the traffic impacts were only on the "community" and thus not covered by the D.C. EPA. *Kingman Park I*, 27 F. Supp. 3d at 162-63.

The D.C. EPA requires the preparation of an EIS whenever a "major action [is proposed or approved] that is likely to have a substantial negative impact on the environment, if implemented." D.C. Code § 8-109.03(a) (2012). The statute in turn defines "environment" as "the physical conditions that will be affected by a proposed action, including but not limited to, the land, air, water, minerals, flora and fauna." D.C. Code § 8-109.02 (2012). In the district court's view, that language excludes impacts on the non-natural environment such as traffic.

The statute also says that its "purpose . . . is to promote the health, safety and welfare of District of Columbia . . . residents, to afford the fullest possible preservation and protection of the environment." D.C. Code § 8-109.01 (2012). The sequence "health, safety, and welfare" appears three times in the statute, and in none of them is the sequence qualified by any limitation to the natural environment. This language suggests inclusion of effects such as traffic and noise felt primarily (or even exclusively, if such can be imagined) as aspects of the human environment.

Defending the district court ruling, the District notes that the D.C. EPA differs from the federal equivalent, 42 U.S.C. § 4332(C), by omitting the word "human" as a modifier of the protected "environment." The logic escapes us. The word "environment" would seem to encompass every environment, whereas the "human environment," if actually intended to be different from the "environment," appears narrower, potentially excluding any "non-human" environment—though as a practical matter such an exclusion would seem very narrow in effect, given the human race's near-ubiquity in the portions of the universe where a government might undertake a project.

Indeed, the suggestion that the (unmodified) "environment" excludes community effects appears hopelessly artificial. Traffic, for example, consists of vehicles moving over the land and through air, impacting the surface, emitting gases, and unleashing sound waves. We find it hard to imagine a concept of the environment that would exclude such effects (unless done so specifically). Unsurprisingly, the District's own Environmental Impact Screening Form asks about traffic impacts. Government of the District of Columbia, One City Street Car Line: H Street / Benning Road NE, Environmental Impact Screening Form (EISF) & Related Studies ("EISF and Related Studies"), Environmental Impact Screening Form at 6.

Though we think reliance on the legislative history is quite unnecessary, that history fits our interpretation:

> The enactment of federal and state laws requiring the preparation of EIS's before undertaking major projects that could potentially damage the environment have proven worthwhile. . . . [S]imilar legislative measures need to be enacted and implemented to further protect

and preserve the *human environment* in the District of Columbia.

D.C. Council, Report on Bill 8-8, District of Columbia Environmental Policy Act of 1989, at 5 (June 5, 1989) (emphasis added).

Given that traffic is within the scope of the D.C. EPA, we now ask whether traffic associated with the Project was "likely to have a substantial negative impact" requiring the preparation of an EIS. The Department of Consumer and Regulatory Affairs explicitly found that it was "not likely to have" such an impact. Letter from Nicholas A. Majett, Director of the D.C. Department of Consumer and Regulatory Affairs to Faisl Hameed, District Department of Transportation, regarding Environmental Impact Screening Form (Feb. 27, 2013). It prepared a 38-page draft "Transportation Technical Report" that it included as part of its Environmental Impact Screening Form for the Project. The report concludes that the Project would not have a substantial impact on traffic conditions in any of the key analyzed sections of the project area. EISF and Related Studies, Transportation Technical Report at 41-43. The analysis addresses the concern about traffic in and out of the Spingarn site, noting that "travel in and out of the yard is only expected to occur outside of peak analysis hours." *Id*. at 10. Given the deference we owe the agency, and the absence of material conflicting evidence, we find no breach of the Department's obligation.

Thus we are unpersuaded by the Association's strongest argument regarding the District's non-preparation of an EIS. It follows that the district court must be affirmed with respect to the substantively weaker EIS arguments.

*Equal Protection*. The Association claims that the District's selection of an overwhelmingly African American neighborhood for the installation of its first streetcar project, which of course might prove to be the last, violated the Equal Protection Clause. But the Supreme Court held in *Washington v. Davis*, 426 U.S. 229, 242 (1976), that "a law neutral on its face and serving ends otherwise within the power of government to pursue, is [not] invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." Rather, a claim of racial discrimination under the Equal Protection Clause requires a showing of "racially discriminatory purpose." *Id*. at 241.

The District did, indeed, cut significant procedural corners, most particularly by giving only belated notice of the construction decision to the local member of the Advisory Neighborhood Commission. *Kingman Park I*, 27 F. Supp. 3d at 150, 169-70; *Kingman Park II*, 27 F. Supp. 3d at 184; Amended Complaint at 5; D.C. Code § 1-309.10 (2012). But the Association has offered no evidence of a racially discriminatory purpose for this failure. The affected area is indeed predominantly African American. But so are many parts of the District. The District has advocated the streetcar program as a whole (a total of 37 miles) on the ground that it will "provide high-capacity and high-quality transit service to District residents and visitors," and has expressed the hope that the investment would "catalyze economic development." EISF and Related Studies, Transportation Technical Report, at v. See also *id*., Historic Architectural Survey at 1. In framing its purposes of selecting specific locations to start, the District has said that its goal was "to transform nine underinvested corridors into thriving and inviting neighborhood centers." *Id*. at 2. The Association doesn't contest the application of those purposes to the Spingarn School area. Accordingly the Project and the associated site selection appear to have been

facially neutral and to serve legitimate government purposes, and thus do not run afoul of the Equal Protection Clause.

The Association makes several other claims that do not warrant discussion in a published opinion. We affirm the judgment of the district court on these other issues.

* * *

The judgment of the district court is

*Affirmed*.